**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-54 (RDM)** |
| **v.** | : | |
| | : | |
| **NICHOLES LENTZ,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Nicholes J. Lentz ("Lentz") to 60 days' home detention and 36 months' probation.

**I.      Introduction**

The defendant, Nicholes Lentz, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars in losses.[1]

On February 22, 2022, Lentz pleaded guilty to one count of 18 U.S.C. § 1752(a)(1): Entering or Remaining in Restricted Buildings or Grounds.  As explained herein, a sentence of home detention and probation, is appropriate in this case because: (1) as a former police officer,

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Lentz was acutely aware of the dangers that his and other rioters' presence at the Capitol posed to law enforcement and members of Congress that day, but he nevertheless continued moving through the Capitol even after witnessing violence against law enforcement; (2) Lentz ignored his better judgment and overlooked numerous red flags in entering the Capitol; and (3) he posted images and statements to social media during the riot that celebrated the siege of the building. The government acknowledges and considers that Lentz also admitted his responsibility to the FBI prior to being arrested, turned himself in upon request, and provided the passcode to his phone.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification, combined with his celebration and endorsement of the mob's actions on that day, requires a significant sentence, in the form of home detention and probation.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent –

contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Nicholes Lentz's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Nicholes Lentz traveled alone to Washington, D.C., from his home in Florida, to attend the "Stop the Steal" rally. Lentz attended the rally on January 6 and after listening to former President Trump's speech near the Ellipse, he moved with the crowd to the Capitol. He unlawfully entered the Capitol grounds and, ultimately, the Capitol itself, where he stayed for nearly an hour.

On the grounds, Lentz saw the use of tear gas and other irritant agents. He persisted towards the building nevertheless. The screenshot below shows Lentz (circled in red), on the West Lawn of the Capitol, watching as an officer (circled in blue) was assaulted by other rioters, while other officers attempted to assist, all with a pink chemical haze in the background.



After this incident, Lentz moved with other rioters closer to the Capitol.  As he approached the building, Lentz posted a photograph of himself to social media, bearing the caption "We the people did it."



The Capitol building was first breached at approximately 2:13 p.m., when a rioter broke a window adjacent to the Senate Wing Door with a riot shield.  Within minutes of that breach, Lentz entered through that same door, and he was inside the Capitol for just under one hour, leaving again through the Senate Wing Door at 3:12 p.m. While inside the Capitol, Lentz made his way through multiple rooms in the besieged building, including the Crypt and the Capitol Visitor Center

While inside the Capitol, Lentz broadcast live on his Facebook page.  Two screenshots from that broadcast are below:



During the 52-second video from which the above screenshots were taken, Lentz stated,

> "America has spoken.  You can not stop millions of people.  Cannot
> stop it.  Can't.  It's impossible.  America has a voice.  We give them
> the power.  We give the power.  The people give the power, and
> we're here to take it back.  [pause] There's honestly been no
> violence to police officers, we're trying our best, I'm trying my best
> to protect all police officers and security that are trying to maintain
> order.  We're not here to hurt any cops of course.  I love my boys in
> blue, but this is overwhelming for them.  There's no way they can,
> there's no way they can, there's no way then can hold us back."

The police were indeed overwhelmed by the actions of Lentz and others.  Lentz lent himself

to the cause that, collectively, trampled police barricades, assaulted officers, overtook a restricted

building, and caused a delay in the certification of the Electoral College vote.  Although Lentz is

not charged with assaulting or interfering with the officers, nor is the government aware of any evidence that he personally assaulted or interfered with officers, it was the mob that made the crimes of January 6th possible, and Lentz was not only part of that mob, but celebrated its successes.

*Nicholes Lentz's Interview*

Lentz voluntarily agreed to an interview with the FBI on January 19, 2021, prior to his arrest.  In the interview, Lentz admitted that he drove to Washington, D.C. from Florida on January 5, 2021, to attend a rally for then-President Trump.  He told the FBI that he was outside with others listening to the President's speech, when the crowd started moving towards the Capitol.  Once he arrived at Capitol grounds, he witnessed about fifteen riot officers push and shove with rioters, and he saw dispersal of what he described as "CS" gas.  Lentz stated that he approached the building, and he saw already-broken windows.  Lentz stated that he entered through the door, and that once inside he stayed on the ground floor.  He claimed that he offered to help Capitol Police officers with crowd control.  He also agreed that he knew he was trespassing, and he provided the agents with a description of the distinctive vest he wore on January 6th.

After a warrant was signed for the defendant's arrest, he agreed to self-surrender to the FBI (which he did without incident), and he also provided agents with the password to his phone.

*The Charges and Plea Agreement*

On February 8, 2021, Lentz was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) & (2) and 40 U.S.C. §§ 5104(e)(2)(D) & (G). On February 19, 2021, he was arrested in Florida. On February 16, 2022, the government filed a one-count Information charging Lentz with a violation of 18 U.S.C. § 1751(a)(1).  On February 22, 2022, he pleaded guilty to the sole

count in the Information. By plea agreement, Lentz agreed to pay $500 in restitution to the Architect of the Capitol.

### III.      Statutory Penalties

The defendant now faces a sentencing on a single count of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR with one minor exception (see f.n. 2 below). According to the PSR, the U.S. Probation Office calculated Lentz's adjusted offense level under the Sentencing Guidelines as follows:

|  |  |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A))[2] | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 27-36.

The U.S. Probation Office calculated Cordon's criminal history as a category I, which is not disputed. PSR at ¶ 39. Accordingly, the U.S. Probation Office calculated Cordon's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 78. Lentz's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*,

---

[2] The PSR incorrectly applies this specific offense characteristic because the trespass occurred "at a **secure government facility**" under U.S.S.G. §2B2.3(b)(1)(A)(i). PSR ¶ 8. As indicated in the defendant's plea agreement, the specific offense characteristic applies because the trespass occurred "**at any restricted building or grounds**" under U.S.S.G. §2B2.3(b)(1)(A)(vii). ECF No. 35 at 3. On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). Because a two-level increase applies under either theory, there is no difference to the final offense level, and the government notes that it missed this mistake in its review of the draft PSR as well.

552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at

101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that "*significantly* increases the likelihood that the sentence is a reasonable

one." *Rita*, 551 U.S. at 347 (emphasis added). In other words, "the Commission's recommendation

of a sentencing range will 'reflect a rough approximation of sentences that might achieve

§ 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate

sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court

knows, the government has charged a considerable number of persons with crimes based on the

January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to

Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and

fairness moving forward.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, a balancing of the § 3553(a) factors a sentence home detention and probation.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should

10

look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.

Lentz was one of the first rioters to enter the Capitol, crossing the threshold within minutes of the first breach of the building and observing broken windows as he entered. At the time Lentz entered, the Senate was still in session. He also stayed in the building for a significant amount of time, nearly an hour. Lentz's conduct is thus unlike some others who entered and quickly exited.

While Lentz was inside, he was not content to simply roam the halls of the building and take selfies (though he did in fact do that). He broadcast live to his social media account, declaring that "America has spoken. You cannot stop millions of people. Cannot stop it. Can't. It's impossible. America has a voice. We give them the power. We give the power. The people give

the power, and we're here to take it back."  The defendant also noted how overwhelmed police were, in the context of this statement.

Lentz traveled through multiple areas of the Capitol, including the Small House Rotunda, the Crypt, and the Capitol Visitors Center.  He returned from the Visitors Center, through the Crypt, and back to the Senate Wing Door, where he left approximately an hour after he entered.

Shortly after January 6th, when he was interviewed by FBI agents on January 19, 2021, Lentz admitted to his conduct from that day, including his entry in the Capitol and an admission that he knew he was trespassing.  He overestimated the amount of time he was in the building, telling the interviewing agents that he thought he was in the building for two hours.  During that interview, he also confirmed for the agents what he was wearing on January 6th and the identity of the social-media account to which he posted the live-stream from within the Capitol.

Accordingly, although the nature and the circumstances of this offense are serious, several factors weight in favor of leniency.  Lentz accepted of responsibility early by speaking to the FBI and admitting his conduct at the earliest possible opportunity, he self-surrendered without incident and he did not personally commit or encourage violence.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Lentz's criminal history consists of traffic infractions and one tobacco offense, none of which contributes any criminal history points. PSR ¶¶ 40-44. From 2016-2020, Lentz served in the U.S. military, and then later as a police officer in Florida.  While Lentz's military and law-enforcement service is laudable, it renders his conduct on January 6 all the more worrisome. As a former military and law-enforcement member, Lentz was well aware that he had no right to enter restricted buildings, and indeed he acknowledged as much in his interview with the FBI. His voluntary decision to storm a guarded government building is troubling in light of his

former military and police service, especially in the context of his knowledge and acknowledgement that the police assigned to guard the building were "overwhelmed."

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan). This case is no different.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6th was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—

14

especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Nicholes Lentz's actions at the Capitol on January 6, 2021, show the need to specifically deter him from engaging in this type of behavior in the future.  His social media posts show that he celebrated the mob's assault on the Capitol, despite the toll it took on police officers.  He was one of the first to enter the building—knowing he was trespassing—and he stayed in the building for nearly an hour.  Although he did not personally assault police officers or destroy property, Lentz's conduct was serious and in breach of the oaths he took as a member of the military and a sworn member of law enforcement.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[4] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A

---

[4] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

probationary sentence should not necessarily become the default.[5] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

As described above and below, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a

---

[5] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of her participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant

distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on Thomas Gallagher, No. 21-cr-41 (CJN) for reference.  Defendant Gallagher entered the Capitol after it was already under siege and witnessed other rioters throwing chairs at officers who were attempting to retreat.  *See United States v. Gallagher*, No. 21-cr-41 (CJN), Gov't Mem. in Aid of Sentencing, ECF 98 at 2-6. Similar to the defendant, the FBI uncovered no evidence that Gallagher engaged in violent or disruptive conduct on January 6th, and Gallagher and the defendant each consented to FBI interviews after their arrest. *See id.* at 6. The defendant additionally provided his phone password to investigators.  Additionally, Gallagher's federal service, *id.* at 10, like the defendant's military and law enforcement history, cuts both ways in assessing his culpability.  Ultimately, the government recommended one month of home detention and 36 months of probation in the *Gallagher* case, and the judge imposed 24 months of probation, along with 60 hours of community service, a fine, and $500 in restitution.

18

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**V.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Nicholes Lentz to 60 days' home detention and 36 months of probation. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      */s/ Erik M. Kenerson*
ERIK M. KENERSON
OH Bar No. 72960
Assistant United States Attorney
U.S. Attorney's          Office
601 D Street, N.W., Room 5-130
Washington, D.C.  20530
Office: 202-252-7201
Erik.Kenerson@usdoj.gov